1902 from the Southern District of Iowa, United States v. Jose Garcia-Ortiz. Alright, Mr. McGough for Magallon. Thank you. Good morning, Chief Justice, members of the court, counsel, may it please the court, my name is Jim McGough and I represent the appellant Leonardo Magallon in this appeal. The, there's two issues in the case, the main issue is that the willful blindness instruction that was given by the court to the jury was improper to be given in this particular case and then the secondary issue was insufficiency of the evidence. In regards to the first issue, the latest case to discuss that, or at least the latest case that was discussed by counsel and myself was the United States v. Trejo case that was a 2016 case and what that case indicated was that the instruction is appropriate if there is a quote high probability that there is some indication of criminal activity and the defendant purposely contrived to avoid learning facts. So those are the two things. The facts in this case established that Mr. Magallon, the appellant, drove with another individual, a person by the name of Camarena, Jr., drove with that person from Vegas to Des Moines hours before a courier, Mr. Ortiz, drove from Vegas to Des Moines. Mr. Magallon was not in the vehicle with drugs. He arrived hours before in Des Moines with Camarena. They stayed at a friend's house, a friend of Camarena, and the next day Mr. Magallon attempted to leave town on his own to go back to Vegas before the drug deal happened. He was not in possession of the drugs, was not in the car with the drugs, and was attempting to leave town before the drug deal happened and he was subsequently detained and arrested. Both- Counsel, what's his defense or what defense was offered to the charge of conspiracy? He didn't know anything about the drug conspiracy and the willful blindness instruction cases say in cases where it comes down to either you knew or you didn't know, the willful blindness instruction is not appropriate. Counsel, let me interrupt you. Isn't this literally a willful blindness case where Tez testifies that your client saw opaque bags transferred containing drugs and he denied, oh, I didn't know what all that was. It's literally blindness to what's going on in front of you so the willful blindness fits this case like a glove. Two things on that, your honor. One would be when Ortiz was first interviewed, he said that my client was not present for that. They showed him a photograph, he said, don't know the guy, wasn't there. At trial he comes in, he still says at trial, he didn't know my client, but he claims that my client was there, but he does say that those bags were either tan or brown and he didn't know what was in the bags as to what was in there and that testimony was quoted in my brief. Yeah, I understand, but I use the word opaque in what I said to you, I don't know if you heard it or not. Yes. And opaque is what makes the blindness even more important. Well it's, I understand your point, your honor, but if you take it in connection with what Ortiz testified about, you couldn't see what was in the bags and has my client there, doesn't have my client there on contradictory statements. The bottom line is he said that he didn't know my client and the person that ordered the drugs from Des Moines didn't know my client. The only person that knew my client was this junior guy who was in the car with my client who was never called to testify by the government. So what my client knew or didn't know from the government's presentation of facts came down to the presentation of that particular witness that the government did not call. That person is the one who asked my client to open a bank account where the money went into, that's the person that asked my client to drive him to Des Moines, that's the person that moved the drugs from one car to another car, and that's the person that was involved in hiring the courier, Mr. Ortiz. So that person was the bridge between what my client knew or didn't know and what my client may have been blind to or not, and that person was not called. The client ended up with the money too, right? The short answer is yes, but what is significant about that is as the government indicated in their brief shortly after the money was deposited into my client's account, he took it out and purchased a vehicle and purchased insurance for the vehicle and the other money was used for road trip expenses, which would be consistent with somebody saying, hey, I don't have a license, can you drive me from Vegas to Des Moines and I'll pay you for your time and your trouble for that. There's no indication, the only person that would be able to establish that my client knew that that was drug proceeds or anything illegal would be Carmina himself, and he didn't testify. He wasn't called by the government to testify. The other significant thing is the body of law. If you look at the cases between counsel and myself, we cited 15 different cases regarding the willful blindness instruction, and of those 15 cases, only four cases dealt with The majority of cases are financial in nature, running money through a fraudulent business, filing false income statements, that kind of thing. But of the four cases that are drug related, one of those cases, the co-conspirators are talking about and using drugs in front of the defendant. In another case, somebody's paid $3,000 a month to store clothing at their house. Their house is searched, drugs, scale, gun is found at that person's residence. Another case, the person's in car with the drugs, and on the last case of the four, the person is introduced to the drug courier by the person that procured the drugs as, this is my partner, this is somebody that I'm teaching the ropes to. So there's direct facts in all of those cases that the person knew or should have known that they were involved in a drug conspiracy that doesn't apply, none of those facts are present in this particular case. This is Judge Smith, what do the facts state as to McGowan's purpose for the trip? There's no facts stating the purpose, other than at the time that McGowan was arrested or detained and arrested when he attempted to leave town before the drug deal happened, he was asked about his trip and he said, I brought my friend down here to visit a friend. So came from Vegas to Des Moines and he and his co-defendant stayed, or not co-defendant but the guy that didn't get called to testify, Junior Carmarina, they stayed at a friend's house and the next morning my client attempted to leave town and he was detained and arrested. So from his perspective, he simply drove some people from one locale to the other? One person, yes. Okay. And he was completely unaware that he was participating in the transportation of narcotics in his state? Yes. And it is significant to note, your honor, that the drugs were not in that car, they were in a different car that left hours later and arrived hours later. But later transferred, the ones we were just talking about, right? Yes. Driven by Mr. Ortiz. Right. Yes. Who's the guy who said, he doesn't even know my client, when he testified. Testified against him. Go ahead. Yes. Mr. McGowan, you're within your rebuttal time, you can continue if you like or you can reserve it. I'd like to reserve it, thank you. Okay. Mr. Bertoli? Yes, thank you. May I please support Chief Judge Smith and the rest and Ms. Jennings. My client, again, is Jose Ruben Garcia Ortiz. He was the driver of the white Lexus automobile, which was where eventually the methamphetamine was recovered from. And he entered a conditional plea of guilty after filing a motion to suppress, which was denied. And obviously ended up being a prosecution witness at the McGowan trial, testifying about what he knew in terms of his participation in the events occurring that started in Las Vegas and wound up in Des Moines, Iowa on the south side. The suppression issue in this case is layered, so to speak, because first of all, the first issue has to do overall with whether or not the law enforcement had reasonable suspicion to conduct an investigatory stop of the vehicle in which Mr. Ortiz was a passenger. Yes. So, sure they got reasonable suspicion when they've been watching these people all this time and running around after them. We have short time. What about, and your argument, I don't care, but I noticed the district judge finds he, your client, readily permitted the police to retrieve the keys. All right, I'm glad you asked that because just when I was experiencing those technical difficulties, I went back and got the suppression transcript. And if you look at the suppression transcript, the pages 61 and 62, what's really important there is that Special Agent Smith, who was interviewing, he was the officer that had contact with Mr. Ortiz, and he was interviewing, I think he interviewed him three times, okay? And the first time, he interviewed him without the benefit of Miranda. And it was at that time when the key was retrieved by a different officer, an apparently officer, Nick Peterson, who did not testify at the suppression hearing. And it is the, the record in this case shows that Peterson, or an unnamed officer, whoever that is, inquired Mr. Ortiz, do you have any sharp objects? And he said, I got a key to a car. And without a warrant, without any Miranda warrants, this officer took that key from his pockets and gave it to, I think, Officer Smith, who then somehow got it to LeManny, who then opened the trunk of the white Lexus that he'd noticed in the parking lot while he was interviewing another suspect, the driver of the vehicle. So, all four of these people were... Counselor, you're getting your time short. We've seen the video. We've read the transcript. So, come to the point, did he readily permit the police to retrieve it, and he acts indifferent almost to whether they get the keys or not. I would call it indifferent. Understand what he's... He's sitting in a patrol car with his handcuffs, hands in his... He has no ability to stop them from taking the key out of his pants pocket. Yeah, they sure discuss it with him. Now, they discuss it with him, in fairness. They just don't reach and grab it. Well, no, they ask if he's got any sharp objects in his pocket. That's the discussion. They also talk about whether he's got a key, where the car is. Well, they did that prior to him being Mirandized. Right, for sure. Yeah. And I think he said originally that the white Lexus is in Las Vegas. It was only after they discovered the methamphetamine, after they got the key, that he actually said that's a key to which he claimed some ownership of the car. He actually told him, this is the car I drove from Las Vegas. It's not Las Vegas. I drove it here. But all that happened in a second subsequent conversation, after they'd retrieved the key, before the Mirandized, Miranda warnings, and after they'd gotten the methamphetamine. He already opened up the trunk by the time he told them anything other than the car is in Las Vegas. Counsel, was the car locked? Yes. Okay, that's the inference, I think. The district court doesn't make an express finding on that. That is the inference, I think, of everything going on. I think when Manning testified that he used the key to unlock the trunk. Yeah, and that is the inference of the district court's finding. The trunk was closed. It wasn't open. What about the district court's finding? The officer made no promises or misrepresentations to the defendant. Well, again, the suppression transcript there, that's, again, Agent Smith. He testified that when he was talking to Ortiz after he'd Mirandized him, that Ortiz was hesitant to say anything, but then he said, are people afraid of anybody? And I don't know if you're going to be coming with us or not, which means a reasonable person would believe, hey, if I talk to this guy, nothing's going to happen. That's a promise of leniency. Now, let's go slowly. That was before the Miranda warning, right? No, that was after the Miranda warning. Oh, it was after Miranda that they started saying... That was after Miranda. Wait, when's the first time they say, I don't know if you're coming with us or not? That's after he's Mirandized. Okay, so after Miranda is the first time that they start that. Right. Are you familiar with a U.S. Supreme Court case called Siebert and this court's case called Aguilar about this two-step interrogation process? Well, I have to say that I'm not. At this point, I didn't... Well, I... I... Go ahead. Is that the... Is that having to do with the double... They called it the Missouri two-step in that case. It came from the Missouri State Courts. It's a two-step interrogation and how the second one can be okay or not okay when it occurs right after. He's talking to them and he gets about a two-minute break, right? Between stuff he's saying and when he gets the Miranda warning. There's about a two-minute break at that. There's a short period of time that he engages in the second or third time while he's still handcuffed in the back of this vehicle. He's handcuffed at all times, right, counsel? Absolutely, from the very beginning. Taken out of the one vehicle, placed in the back of whosoever car it was. The law enforcement car. And it was a very short period of time. On the second or the third contact that Officer Smith is asking questions until he Mirandizes him. But it's clear that the bulk of the discussion about you may or may not be coming with us is while he's eliciting statements after he's Mirandized. So, I don't know how much time I have left. I don't see the clock. You just have a minute and a half. Would you like to retain that? I'll retain that, thank you. All right. Ms. Jennings? Good morning, your honors. May it please the court. My name is Amy Jennings and I represent the United States in this case. I'll start off where Mr. Bertoli is at in his argument. And that is the consent and the voluntariness of that consent for Mr. Garcia-Ortiz. The government's argument is that the defendant, excuse me, the district court properly found that the consent in this case was voluntary based on analysis of the relevant factors that are set out in the case law. As the court has indicated, it has access to the video. And the court can see by watching the video that while this was a time frame in which the defendant was in the back of a police car and engaged in several different interviews with the law enforcement officer, the law enforcement officer was always polite. He was respectful. He wasn't using any type of coercion or intimidation. The district court correctly found that factually the defendant did not give any indication that he was intimidated by law enforcement and appropriate analysis of that, of those factors show that the consent was voluntary in this case. Let me interrupt you counsel, because the district court says, I'm quoting, and this is the only finding I think on this, he readily permitted the police to retrieve the keys. Do you think readily is right? Have you watched that tape readily? I think what the district court was getting at is what your honor was alluding to earlier. There was significant discussion about the key prior to law enforcement removing it from his pocket, probably because there was some personal invasion there and having a person stick a hand in the defendant's pocket. I think that's what the district court was alluding to. I would like to correct the record with respect to when the key was removed from the defendant's pocket and I think we've got it right and of course the court can look at the video, but in the defendant's brief he seems to suggest on page 8 that the key was removed sometime prior to the defendant getting in the back of the police car. We know that's not what happened. The interviews took place, the court can see that Special Agent Smith, the primary interviewing agent, asked the defendant about the white Lexus, if he had the key to the white Lexus, where the white Lexus was at, and that the defendant indicated he had the key in his pocket. The removal by another officer who didn't testify in the government's mind is not material. The court can see the interaction that happened there with Special Agent Smith who obtained the consent and the only role that that other officer had was physically removing it from the defendant's pocket. So the government wanted to make sure that the court understood the key was in the defendant's pocket until and after Special Agent Smith obtained voluntary consent to remove that from his pocket. With respect to the promises and misrepresentations argument, again, the video shows that Special Agent Smith was in the middle of an investigation. He didn't know what Mr. Garcia-Ortiz's involvement was. They were looking for 10 pounds of methamphetamine that was supposed to be delivered from Nevada to Iowa that night, and he didn't know if he would be coming with law enforcement at that point or if he would not be coming with law enforcement, and that's what he was communicating to the defendant at that time. You don't think that amounts to a promise? No, especially not a promise to the extent that would be necessary to show that his will was overborne in order to make this involuntary consent. He in no way promised the defendant, if you talk to us, you won't go to jail. There was nothing along those lines, and to the extent that the defendant interpreted it as a promise, the court has said that promises of leniency in exchange for cooperation, that does not render a consent or an interview involuntary in other cases such as Bob Glau, EOS, LACU, which the government cited in its brief, as well as some other cases. Are you familiar with this Garcia-Garcia case? I am not, your honor. That's a very recent case in fairness to you. It came down April 29th. It says that compliance and silence can show voluntary consent, but if the environment is not inherently coercive, and that's at a bus station where they talk just a few minutes in the middle of a bus terminal, this is a person that's handcuffed in the back of a police car for two hours. If you apply the Garcia-Garcia case, how can this consent be compliance and silence? It's certainly not ready. I think readily has almost no support in the record. Feel free to defend it readily, but he didn't readily, he couldn't readily do anything, candidly. So how do you reply to the, take it from me that Garcia-Garcia says compliance and silence can show voluntary consent. But it says, at least in a situation where the environment is not inherently coercive. This is an inherently coercive environment, don't you think? I think that there's aspects of it that could be, when looking at it alone, the handcuff and in the back of a police car is arguably could be coercive, but I think when you're looking at this issue, I think you said silence and compliance can suggest voluntariness. And I think it's a very fact-intensive question before the court. And if you look at these particular set of facts and watch the video, you have a defendant who clearly was not coerced. He was spoken to in a respectful, kind manner. He was talked to by law enforcement about where the police car was at, where they had found it. And although there might, the two aspects of being handcuffed and in the back of a police car might be coercive, on this record, you look at all of the different factors that are in the case law, including... You'd agree with me that at best he's really just indifferent. He seems indifferent. I mean, if I had to pick a word,  In my view, he voluntarily consented to give the key... No, he doesn't say those kinds of words, counsel. He doesn't voluntarily consent. What words do you point to? I'm sorry, I should ask a question. What words can you point to where he voluntarily consented to that? In my recollection, in watching the video, Special Agent Smith asked the defendant, do you have the keys to that car? And he says, yes or no. And he says something along the lines of where are the keys? And he says in his pocket. And law enforcement says, do you have the keys? And he says, sure. You think he says sure or does he just do his head? I think he says a verbal yes or no. Okay. We'll see. I can't quite remember to tell you the truth. But I don't think he nods or that. He does it at an angle, kind of half between the nod and the shake the court reporters use. So I didn't know what to make of that. My recollection of the video which I watched yesterday was clear to the defendant. They were asking, can we get the keys to the car? He knew that. We can see the video. He understood the question. He said, yes. I think the officer might have asked, are you sure? Or where is it? And I think the officer paused and said that might be a little weird because it's in your pocket. So there wasn't a jumping in and immediately removing physically to come around the side. It was a deliberate, thoughtful process of removing that key. And the defendant at no time just said, don't take this. I'm not giving you consent. After he nodded and said, you can take the key, his physical reaction to having the key removed was consistent. I'm going to switch on you here because the district court suppressed the pre-Miranda statement. Right? Well, boy, under the United States Seabird case, and our case, and our court's Aguilar case, don't you have to suppress this whole thing? Are you familiar with the Seabird case? The two-step interrogation case? I'm familiar with the idea of the two-step interrogation both in how you can cure the second interview and as well as the of the allegation that it's an interviewing tactic to do a non-Mirandized interview than Mirandized in order to get that later information. And in this case, the court, I think, really took into consideration, as you can tell by detailed factual findings, that the nature of this investigation and that at the time they didn't know Garcia Ortiz's involvement so that was why he was not Mirandized immediately because of the ongoing developing nature of the investigation. And I think that the district court appropriately relied on the Supreme Court case in finding that. Oh no, that's the Elstad case, right? Yes. Counsel, this court held right after that that Elstad is limited to its facts. Did you know that? That's the Aguilar case. I don't make this up. Aguilar says in plain English that Elstad is limited to its facts because Justice Kennedy is the controlling vote in the Siebert case. Justice Kennedy acts like there's supposed to be a time break between when you're talking to him and I think a hearing motion gets a minute or two, right? And he's handcuffed during those two minutes. So my goodness if the pre-Miranda falls in this case, surely the post-Miranda falls. What does that do to your case? Well, in the government's view it is limited to the facts, Elstad and that all of these determinations are based on a factual determination. And in this case the facts show that he made a voluntary waiver after the un-Mirandized warning. He had a break of a few minutes. When the officer came back in they talked to him about what his Miranda rights were. We know his age. We know his demeanor. We know that he wasn't intoxicated at the time. And we can see from the video itself we're not relying on agent testimony we can see from the video itself his level of understanding and intelligence of the facts. Counsel, if you look at the Elstad case the Elstad talks about the time and the environment. Justice Kennedy, I think, at the end of his opinion only mentions those two. I could be wrong. But he certainly mentions the time and the environment. And the time is a minute or two, right, from when you stop asking questions in general and then you go right into the Mirandized part. And then the other point is the environment. This couldn't be a more coercive environment. How many police officers are there? Do you remember? Or no? There were police officers at multiple scenes in that investigation. There were some at the apartment complex where the defendant was at. There were some at the house where Magallon and Estrada Camarena were. There are a lot of police running around this place. There were. Go ahead. Correct, Your Honor. I think that as the case law points out the factors of the environment and the time frame are two factors that are to be considered but there's a number of other factors as well. Counsel, I'm not so sure that after Justice Kennedy's concurrence that controls By the way, our regular case also says Justice Kennedy's concurrence controls. Just so you know. I'm not so sure that we have so many factors anymore. In the government's view Oh, the two-step. That has to be a two-step. In the government's view when you look at the reporting and you take into consideration where the defendant is at in the back of the car and that he handcuffed and you look at all if you look at the video and you can analyze whether or not that was a willing voluntary Miranda waiver. In the government's view the district court correctly viewed that video and saw the fact that he was able to understand those warnings. He was able to read those warnings intelligently and that an important factor also of course in the coercive analysis is how the officer is acting and the number of officers that are interviewing a defendant. Let me interrupt you because I believe the video speaks for itself. We won't pursue it. The key thing with Justice Kennedy is the motive of the police officers and their intent to do this two-step. That's where he splits with both the four dissenters and the four in the majority. Let me ask you if you lose the post-Miranda statements of Ortiz what does that do to your case against Ortiz? The government believes that the condition still would stand even if we lose the post-Miranda statements we would still have the drugs at that point and also his the fact that he was arrested with he was found to be with Estrada Camarena and Magallon so it's the government's position that his conviction would still survive. There was a lot of testimony that he drove, right? There is a lot of testimony that he drove. The white Lexus from Nevada to Iowa. And other people testified it was because of his having a clean driving record, correct? That's correct. You heard me, that other people testified. And Counselor, what does it mean in this case that you know it's sentencing the district judge goes out of his way to find Ortiz credible, right? That's correct. Oh boy, that really helps his suppression testimony, huh? Well, I think that he found him credible in his trial testimony and I don't believe that there's anything that um that is directly contradictory in the defendant's suppression testimony with the video. When we look at the video of course we can see you know first hand what happened in the back of that police car in regards and compare that to what And I'm taking too much of your time on Ortiz because I think those are the toughest issues but your time's getting short so feel free to turn to the other defendant or whatever you want to do. Perfect. Uh with respect to uh the length of the stop the government believes that the district court properly found that it was appropriately tied to the investigative mission which in this case was to determine whether or not these individuals were involved in drug trafficking. As the government has already stated the district court made very complete factual findings about the nature of the investigation and how it was developing on scene. Uh while the while Mr. Garcia Ortiz was in the back of the police car um there was other important investigative developments such as finding Estrada Camarena's stuff bag at the house determining why the vehicle that the occupant was asking to the apartment complex finding the right license interviewing the driver of the vehicle who was Anthony Salas and reviewing his phone to determine whether or not there was uh excessive use. So as far as the delay in interviewing the defendant and the delay of the stop overall the district court possibly found that it was tied to the the case             complex was in the vehicle that the defendant was asking to the apartment complex to determine if the vehicle was being used for that purpose. The government agrees with Judge Benson. This is the classic case of willful blindness. We have a defendant who has cleared evidence that he has been directly involved in a criminal scheme and a willful violence instruction is particularly appropriate when the defendant denies any knowledge of a criminal case despite strong evidence to the contrary. The district court did not abuse its discretion in giving the willful blindness instruction in this case. The evidence of Magallo knowing about the criminal activity was quite well documented in this case. There were text messages between Estrada and Magallo in the days before I believe it was April 2nd in the days before their trip which occurred on April 6th and April 7th that Estrada Camarena text Magallo that he put in the order and as soon as he gets it they're out of there and that Estrada Camarena was also asking Magallo if he had money to pay for the expenses related to the trip. Magallo talked on jail calls that he made sure there was no methamphetamine in his car or in the house and this type of evidence shows that the defendant was trying to distance himself from knowledge or being imputed knowledge of the methamphetamine. So the government agrees with Judge Magallo   was distracting himself from the local blindness instruction. With respect to the evidence argument as to Mr. Magallo in this case it was a circumstantial case in large part but again there was direct evidence as the testimony that Magallo was present in the vehicle that contained the drugs the black infinity in Nevada and that he saw Magallo removed those drugs from his vehicle and I appreciate the heads up. Alright. Mr. Magallo your rebuttal please. Thank you. First of all I take issue with Ms. Jennings position that there was evidence that my client was quote directly involved in any drug conspiracy. The text messages were about getting together and making the trip. There was nothing specific to drug or even drug code during those text messages between those two guys and then as far as the jailhouse phone call that my client made to his girlfriend at the time he indicated that the case was about glass that the cops had found some glass and indicated to her that he didn't have anything with him and he wasn't involved in it. He didn't make any indication that he purposely attempted to not be in a vehicle with drugs. I think if that testimony was there that would certainly weigh against me on the willful blindness kind of instruction. But that testimony was not there and that's not what that phone call says. The case is required not just a high probability knowledge of a high probability of criminal activity but also purposely contriving to avoid finding out more facts and that just isn't present here. There's a number of things that look problematic I get that but it falls more in the category of mere presence than it does in willfully doing something that would  to do. Thank you counsel. Mr. Bertoli? Mr. Bertoli? Can you hear me now? Yes I can. Following up    about the government's position that it's voluntary I think Judge Justice Bertoli I think the government is in a position to    clear understanding of the situation and the circumstances under which Mr. Ortiz was being this whole environment. He's in the back of the squad car from the minute he's taken out of one car handcuffed and he doesn't move. That video shows about almost 53 minutes of him just sitting there handcuffed in the back of this car by himself. The judge suppressed the evidence from the pre-Mirandi statements and I think under the precedent that Justice Benton has provided the court this morning with, that certainly it's the rest of the interview, the rest of the statements and the rest of what happened after that first 17 minutes of un-Mirandized conversation has to be suppressed including a statement and obviously with regards to the search of the Lexus, I point to Mr. Garcia-Ortiz's testimony of the suppression hearing which occurred between pages 81 and 88 in which he candidly was cross-examined by Ms. Jennings and she was trying to get him to admit he consented and he said, I don't remember what I said, but I know they took the key from me. I didn't tell him you could have it. But from his perspective he didn't have any other choice. He was sitting in the back of the squad car and they were asking him about this key and he said he's got a key and they take it. What's he going to do? Say don't take that key? These are guys that are investigating a drug offense and they've got a white Lexus they can't get into. They want to get into it. That's all I have to say about that. Thank you. I did have one question for you. Counsel for the government had notified the court about Mr. Ortiz's release from the BOP. I was wondering if you had any response or if you would concede that your role enhancement issue is out. I concede the role enhancement issue of whether he's a minimum participant or a minor participant is moved. Yes. Thank you. The court wants to thank all counsel for your participation this morning. I especially want to thank you for your patience as we work through the technical issues of getting things started today. We've been having virtual arguments now for several months and this is the most glitches I've seen in one particular argument delaying us nearly a half hour.  will not continue, but I appreciate your patience. You've been helpful to the court.